# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE KIND LLC "HEALTHY AND ALL NATURAL" LITIGATION

This Document Relates to:

ALL ACTIONS

15-MD-2645 (WHP)
15-MC-2645 (WHP)

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

(William H. Pauley III, District Judge)

Plaintiffs, on behalf of themselves and all others similarly situated, by their undersigned counsel, for this class action Complaint against Defendant, KIND LLC, and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities (hereinafter referred to as "Defendant" or "KIND"), allege as follows:

## I. INTRODUCTION

1.      This is a consumer protection and false advertising class action.  Defendant markets, advertises, and distributes various snack foods under the KIND brand name, which it prominently advertises as "All Natural" and/or "Non GMO." The snack food products at issue include, without limitation:

1) KIND Bar Fruit & Nut: Almond & Apricot;
2) KIND Bar Fruit & Nut: Almond & Coconut;
3) KIND Bar Fruit & Nut: Almonds & Apricots in Yogurt;
4) KIND Bar Fruit & Nut: Apple Cinnamon & Pecan;
5) KIND Bar Fruit & Nut: Blueberry Vanilla & Cashew;
6) KIND Bar Fruit & Nut: Dark Chocolate Almond & Coconut
7) KIND Bar Fruit & Nut: Fruit & Nut Delight;
8) KIND Bar Fruit & Nut: Fruit & Nuts in Yogurt;
9) KIND Bar Fruit & Nut: Nut Delight;
10) KIND Bar Fruit & Nut: Peanut Butter & Strawberry;
11) KIND Bar Plus: Almond Cashew With Flax + Omega 3;
12) KIND Bar Plus: Almond Walnut Macadamia with Peanuts;
13) KIND Bar Plus: Blueberry Pecan;
14) KIND Bar Plus: Cranberry Almond + Antioxidants with Macadamia Nuts;
15) KIND Bar Plus: Dark Chocolate Cherry Cashew + Antioxidants;
16) KIND Bar Plus: Peanut Butter Dark Chocolate + Protein;
17) KIND Bar Plus: Pomegranate Blueberry Pistachio + Antioxidants;
18) KIND Bar Nuts & Spices: Caramel Almond & Sea Salt;
19) KIND Bar Nuts & Spices: Cashew & Ginger Spice;
20) KIND Bar Nuts & Spices: Dark Chocolate Chili Almond;
21) KIND Bar Nuts & Spices: Dark Chocolate Cinnamon Pecan;
22) KIND Bar Nuts & Spices: Dark Chocolate Mocha Almond;
23) KIND Bar Nuts & Spices: Dark Chocolate Nuts & Sea Salt;
24) KIND Bar Nuts & Spices: Honey Roasted Nuts & Sea Salt;
25) KIND Bar Nuts & Spices: Madagascar Vanilla Almond;
26) KIND Bar Nuts & Spices: Maple Glazed Pecan & Sea Salt;

27) KIND Healthy Grains Bar: Dark Chocolate Chunk;
28) KIND Healthy Grains Bar: Maple Pumpkin Seeds with Sea Salt;
29) KIND Healthy Grains Bar: Oats & Honey with Toasted Coconut;
30) KIND Healthy Grains Bar: Peanut Butter Dark Chocolate;
31) KIND Healthy Grains Bar: Vanilla Blueberry;
32) KIND Healthy Grains Clusters: Banana Nut Clusters;
33) KIND Healthy Grains Clusters: Cinnamon Oat Clusters with Flax Seeds;
34) KIND Healthy Grains Clusters: Fruit & Nut Clusters;
35) KIND Healthy Grains Clusters: Maple Quinoa Clusters with Chia Seeds;
36) KIND Healthy Grains Clusters: Oats & Honey Clusters with Toasted Coconut;
37) KIND Healthy Grains Clusters: Peanut Butter Whole Grain Clusters;
38) KIND Healthy Grains Clusters: Raspberry Clusters with Chia Seeds; and
39) KIND Healthy Grains Clusters: Vanilla Blueberry Clusters with Flax Seeds.

(collectively, the "Products").

2.    Defendant's "non-GMO" representations concerning the Products are false.  The Products are made with genetically modified crops.  A genetically modified ("GM") crop, such as the canola, corn, and soy from which the Products are derived, is a crop whose genetic material has been altered by humans using genetic engineering techniques.  The World Health Organization defines GM organisms (GMOs, which include crops) as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."  GM crops are not natural, but man-made.  There are wide-ranging controversies related to GM crops, including health risks from ingesting GM foods and negative environmental effects associated with growing GM crops.

3.    Additionally, the Products are not all natural.  The Products contain ingredients that are so heavily processed that they bear no chemical resemblance to the sources from which they were derived.  Through heavy industrialized processing, these ingredients have become man-made, rather than natural.  Ironically, the GM attributes of the ingredients, where applicable, persist after this heavy processing because the changes are chemical, and not genetic.

4.      Although the Products are not non-GMO or "all natural," Defendant prominently labels every Product sold in the United States as "All Natural" and "Non GMO."  Defendant does this because consumers perceive all natural and non-GMO foods as better, healthier, and more wholesome.  In fact, the market for all natural and non-GMO foods has grown rapidly in recent years, a trend for which Defendant seeks to take advantage through false advertising.  As a result, consumers are willing to, and do, pay more than they pay for other comparable products that are not falsely labeled.

5.      While it is undeniable that the Products have been a marketing sensation and an unmitigated financial success, Defendant's success has been the result of fraudulent, unlawful, and unfair business practices in the marketing and sale of the Products.  These practices are plainly improper and unacceptable—particularly for a company that touts, "One foundational principle underpins it all: there's more to business than just profits."

6.      Plaintiffs bring claims individually and on behalf of all similarly situated consumers against Defendant for breach of express warranty, unjust enrichment, negligent misrepresentation, and violations of New York General Business Law § 349 ("NYGBL 349"), New York General Business Law § 350 ("NYGBL 350"), the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CCLRA"), the California False Advertising Law, Cal Bus. & Prof. Code § 17500, *et seq.* (the "CFAL"), the California Unfair Competition Law, Cal Bus. & Prof. Code § 17200, *et seq.* (the "CUCL"), and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (the "FDUTPA").

## II. PARTIES

7.      Plaintiff Amanda Short is a citizen and resident of Brooklyn, New York.  Since

November 2012, Plaintiff Short has purchased, at drug stores in Manhattan and Starbucks

locations in New York City, a variety of the Products, including KIND "Fruit & Nut" Almond &

Apricot Bars, KIND "Plus" Dark Chocolate Cherry Cashew + Antioxidants Bars, and KIND

"Nuts & Spices" Dark Chocolate Nuts & Sea Salt Bars.  Plaintiff Short made these purchases in

reliance on the representations on the product labels that the products were "all-natural" and non-

GMO.  Plaintiff Short would not have purchased, and/or would not have paid a price premium

for, the Products had she known that the Products were neither all-natural nor non-GMO.

8.      Plaintiff Sarah Thomas is a citizen and resident of Astoria, New York.  Since

January 2014, Plaintiff Thomas has purchased, at markets in Brooklyn and Queens, and at a yoga

studio in Manhattan, a variety of the Products, including KIND "Fruit & Nut" Almond &

Coconut Bars, KIND "Plus" Peanut Butter Dark Chocolate + Protein Bars, KIND "Nuts &

Spices" Dark Chocolate Nuts Chili Almond Bars, KIND "Nuts & Spices" Cashew & Ginger

Spice Bars, and KIND "Nuts & Spices" Dark Chocolate Nuts & Sea Salt Bars.  Plaintiff Thomas

made these purchases in reliance on the representations on the product labels that the products

were "all-natural" and non-GMO.  Plaintiff Thomas would not have purchased, and/or would not

have paid a price premium for, the Products had she known that the Products were neither all-

natural nor non-GMO.

9.      Plaintiff Charity Bustamante is a citizen and resident of San Diego, California and

purchased many of the Products including without limitation "KIND Bar Plus: Peanut Butter

Dark Chocolate + Protein," "KIND Bar Nuts & Spices: Dark Chocolate Nuts & Sea Salt,"

"KIND Bar Plus: Cranberry Almond + Antioxidants with Macadamia Nuts," and "KIND Bar

Plus: Dark Chocolate Cherry Cashew + Antioxidants," in San Diego and Los Angeles Counties, including at Target in Poway, California during the relevant time period.  Plaintiff Bustamante purchased the Products in reliance on Defendant's representations that the products were "all natural" and non-GMO.  Plaintiff Bustamante would not have purchased the Products, would not have paid as much for the Products, or would have purchased alternative products in absence of the representations.

10.     Plaintiff Elizabeth Livingston is a citizen and resident of Pembroke Pines, Florida. During the relevant time period, Plaintiff Livingston purchased, at various retail stores, a variety of the Products, including KIND "Fruit & Nut" Almond & Coconut Bars, KIND "Plus" Peanut Butter Dark Chocolate + Protein Bars, and KIND "Plus" Dark Chocolate Cherry Cashew + Antioxidants Bars.  Plaintiff Livingston made these purchases in reliance on the representations on the product labels that the products were "all natural," non-GMO and had various specified health characteristics.  Plaintiff Livingston would not have purchased, and/or would not have paid a price premium for, the Products had she known that the Products were not "all natural" and/or non-GMO or did not contain the benefits advertised.

11.     Defendant, KIND LLC, is a Delaware limited liability company with its principal place of business in New York, New York.  KIND is an international manufacturer, distributor, and seller of various snack products, including fruit & nut bars and granola bars.  KIND was established in 2004 and markets itself as "healthy" through its brAND philosophy.[1]  KIND's products can be found in approximately 150,000 retail stores in the United States.  In 2014, KIND sold 458 million units in the United States and generated approximately $391 million in

---

[1] *See*  http://www.kindsnacks.com/about/

revenue.[2]  KIND does business in New York, Illinois, California, Florida, and throughout the United States.

### III.  JURISDICTION AND VENUE

12.    <u>Subject Matter Jurisdiction</u>.  This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) in that: (1) this is a class action involving more than 1,000 class members; (2) Plaintiffs propose a nationwide class action, while Defendant is a citizen of the State of New York; and (3) the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs.

13.    <u>Personal Jurisdiction</u>.  This Court has personal jurisdiction over Defendant because Defendant does business in and throughout the State of New York through the promotion, sale, marketing, and distribution of its products, and the wrongful acts alleged in this Complaint were committed in among other venues New York.

14.    <u>Venue</u>.  Venue is proper in this District pursuant to: (1) 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and 28 U.S.C. § 1391(d) because the transactions giving rise to the claims occurred in Kings and Queens Counties, New York; and (2) 28 U.S.C. § 1391(b)(3) in that Defendant is subject to personal jurisdiction in this District.

---

[2] *See* Danielle Burger and Craig Giammona, Kind Bars Aren't Healthy Enough for 'Healthy' Tag, FDA Says, Bloomberg Business, April 14, 2015, http://www.bloomberg.com/news/articles/2015-04-14/kind-bars-aren-t-healthy-enough-for-healthy-label-fda-says.

## IV.  FACTUAL ALLEGATIONS

**A.    "Natural," and "Non-GMO" Are Highly Profitable Descriptors**

15.    Product packaging is a significant vehicle through which the purveyors of natural and organic food products communicate material that they believe, and reasonably expect, to be important to consumers in making purchasing decisions.

16.    The health food market is no longer a niche market.  Consumers have become increasingly conscious about natural and non-GMO foods since the 1970s.  They seek out and covet food products that are natural and non-GMO and look for labels that convey these qualities in the foods they choose to purchase.  According to *Natural Foods Merchandiser*, a leading information provider for the natural, organic, and health food industry, the natural food industry enjoyed over $81 billion in total revenue in 2010 and has grown significantly since.  The market for all natural and organic foods grew 9% in 2010 to $39 billion, and 2010 sales were 63% higher than sales in 2005.  Consumer demand for all natural and organic foods is expected to grow 103% between 2010 and 2015.

17.    The designations "natural," "organic," and "non-GMO" appeal to consumers for their health attributes.  These designations also appeal to reasonable consumers' interests in protecting the environment, promoting sustainable living and local farming, and minimizing both people's and the Earth's exposure to pesticides and other toxins.

18.    According to a 2008 article in *The Economist*, "natural" products are a fast growing market because of the power of "mother nature," which conjures up images of heart-warming, healthy wholesomeness, and simplicity.

7

19.     Any doubt about the money generating power of natural foods is dispelled by the entry and success of large conglomerates in the health food market.  For example, the well-known *Kashi* brand name is owned by *Kellogg's*.  The *Odwalla* brand has flourished and expanded significantly since its purchase by the *Coca-Cola Company* in 2001 for $181 million.

**B.     The KIND Marketing Scheme**

20.     KIND was founded by Daniel Lubetzky in 2004.  Frustrated that he could not find the type of healthy, portable snack that he craved, Lubetzky says he started KIND with the mission to produce tasty and attractive offerings with only ingredients that consumers could "see and pronounce."

21.     In a December 15, 2011 interview with *The Wall Street Journal* entitled "Healthy Cravings Feeds 'Kind' Bars," Lubetzky offered the following marketing approach that separates the Products from other health food makers:

> The way we win in the marketplace is by being authentic and transparent.  It's not just the transparent wrapper.  It's the process we use, the ingredients we use, the names of our products.  We don't come up with hokey names.  We tell you exactly what the products are that you get.

22.     This marketing approach, which Defendant presents to consumers and others as its "philosophy" and as a "movement," permeates Defendant's extensive self-promotion designed to present Defendant as a transparent and responsible purveyor of snacks that consumers can trust to be natural.

23.     Defendant's marketing, including its website, reads:

> Ingredients you can see & pronounce

8

We believe if you can't pronounce an ingredient, it shouldn't go in your body.  Actually, it shouldn't even go in your pantry.  That's why all KIND Healthy Snacks are made from all-natural whole nuts, fruits and whole grains.  No secret ingredients and absolutely nothing artificial here.  Just a delicious way of getting your body essential nutrients like fiber, protein and antioxidants (to name a few).

24.    Furthermore, on its website, Defendant summarizes its core principle that "One foundational belief underpins it all:  There's more to business than just profit."

25.    These marketing statements and others, including its website content, underscore and validate Defendant's "philosophy" and "movement," which implores consumers to be kind, like Defendant, in all things, including what they put in their body.  Defendant repeatedly references the terms "natural," and "all natural" in describing its Products.  Photographs of healthy looking people, doing healthy things, with depictions of "KIND Healthy Snacks" on shirts and vehicles are featured prominently.  Consumers are asked to share their acts of kindness with other KIND Product customers.  Defendant undertakes "missions" and seeks out consumer "pledges" that emphasize being kind, like Defendant, in all things.  This marketing scheme is designed to and does in fact promote Defendant, giving its alleged "philosophy" and "movement" credibility as a trusted and transparent purveyor of natural health foods with the utmost integrity.

26.    Defendant's marketing scheme has catapulted KIND founder, Lubetzky, to the forefront of national media for his marketing success.  On the strength of this "philosophy" and "movement," Lubetzky and Defendant have succeeded in the creation of strategic alliances with businesses such as Starbucks and Whole Foods Market, which have provided a massive distribution network for the Products.

9

27.     Defendant's financial performance reflects the enormous success of its marketing scheme.  In 2008, Defendant was able to attract a $20 million private equity investment by VMG Capital.  By 2010, Defendant's annual revenues were approximately $50 million.  In 2011, annual revenues were over $100 million.  In 2014, Defendant succeeded to the point that it valued itself at $728.5 million based on 3.7 times its 2013 annual revenue of nearly $197 million. Lubetzky himself profited so much from Defendant's skyrocketing financial success that in early 2014, he was able to buy back VMG Capital's $20 million minority investment for $220 million, including $200 million in cash.

28.     Defendant's success has been awe-inspiring.  This success would be laudable if its core marketing representation of all natural and non-GMO Products were actually transparent and honest.

**C.     The Products Are Not "All Natural" or Non-GMO As Labeled**

29.     Since April 17, 2011, the majority of products sold by Defendant have been and continue to be labeled "All Natural," including, without limitation, the Products identified herein.

30.     The Products, including those identified immediately above, feature the following prominent labeling representation and warranty on the front of the bar's packaging:  "ALL NATURAL / NON GMO" followed by a check mark.

31.     Below is an example of a KIND product bearing the term "ALL NATURAL / NON GMO":



32.     All Products, including those specifically identified above, contain ingredients
that are synthetic, chemically synthesized, highly processed, and/or contain GMOs.

33.     Testing completed on June 1, 2016 detected the presence of GMOs in at least
some of the Products, including KIND Bar Plus: Peanut Butter Dark Chocolate + Protein.  This
Product tested positive GMO soy from the ingredient soy protein isolate.  Plaintiffs Thomas,
Bustamante, and Livingston all purchased this Product.

34.     Many other Products also contain ingredients that are produced using GMO crops,
including canola, corn, and soy.  However, some of these ingredients are so heavily processed
that the GMO DNA from their original sources is no longer detectable in the finished Products.
Ironically, the GM attributes of these ingredients persist after this heavy processing because the
changes are chemical, and not genetic.

35.     As further detailed below, these heavily-processed ingredients originating from
GMO crops include, without limitation:

a.     Soy lecithin is derived from GMO soy and found in at least 25 of the 39
Products, including the following Products purchased by Plaintiffs: Plaintiff Short purchased
KIND "Fruit & Nut" Almond & Apricot Bars, KIND "Plus" Dark Chocolate Cherry Cashew +
Antioxidants Bars,  and KIND "Nuts & Spices" Dark Chocolate Nuts & Sea Salt Bars; Plaintiff
Thomas purchased KIND "Fruit & Nut" Almond & Coconut Bars, KIND "Plus" Peanut Butter

Dark Chocolate + Protein Bars, KIND "Nuts & Spices" Dark Chocolate Nuts Chili Almond

Bars, KIND "Nuts & Spices" Cashew & Ginger Spice, and KIND "Nuts & Spices" Dark

Chocolate Nuts & Sea Salt Bars; Plaintiff Bustamante purchased many of these specific

Products; and Plaintiff Livingston purchased KIND "Fruit & Nut" Almond & Coconut Bars,

KIND "Plus" Peanut Butter Dark Chocolate + Protein Bars, and KIND "Plus" Dark Chocolate

Cherry Cashew + Antioxidants Bars;

        b.      Glucose syrup / "non GMO" glucose is derived from GMO corn and

found in at least 25 of the 39 Products, including the following Products purchased by Plaintiffs:

Plaintiff Short purchased KIND "Fruit & Nut" Almond & Apricot Bars, KIND "Plus" Dark

Chocolate Cherry Cashew + Antioxidants Bars, and KIND "Nuts & Spices" Dark Chocolate

Nuts & Sea Salt Bars; Plaintiff Thomas purchased KIND "Fruit & Nut" Almond & Coconut

Bars, KIND "Plus" Peanut Butter Dark Chocolate + Protein Bars, KIND "Nuts & Spices" Dark

Chocolate Nuts Chili Almond Bars, KIND "Nuts & Spices" Cashew & Ginger Spice, and KIND

"Nuts & Spices" Dark Chocolate Nuts & Sea Salt Bars; Plaintiff Bustamante purchased many of

these specific Products including without limitation KIND Bar Plus: Peanut Butter Dark

Chocolate + Protein; and Plaintiff Livingston purchased KIND "Fruit & Nut" Almond &

Coconut Bars, KIND "Plus" Peanut Butter Dark Chocolate + Protein Bars, and KIND "Plus"

Dark Chocolate Cherry Cashew + Antioxidants Bars;

        c.      Vegetable glycerine is derived from GMO corn and found in 10 of the 39

Products, including the following Products purchased by Plaintiffs: Plaintiff Short purchased

KIND "Fruit & Nut" Almond & Apricot Bars;

        d.      Canola oil is derived from GMO canola and found in 11 of the 39

Products; and

      e.      Ascorbic acid is derived from GMO corn and found in 3 of the 39 Products, including the following Products purchased by Plaintiffs: Plaintiffs Short and Livingston purchased KIND "Plus" Dark Chocolate Cherry Cashew + Antioxidants Bars.

36.      Despite the presence of these GMO-based ingredients, Defendant represents prominently on its consumer packaging that the Products are "Non-GMO."  They are not.

37.      The presence of genetically modified ingredients in the Products renders Defendant's descriptions of "non-GMO" false and misleading under an objective reasonable consumer standard.

38.      Defendant also represents prominently on its consumer packaging that the Products are "All Natural."  They are not.

39.      The New Oxford American Dictionary defines "natural" as "existing in or caused by nature; not made or caused by humankind."[3]  "All" is defined as "the whole quantity or extent of a group or thing."[4]

40.      By labeling the Products as "all natural," Defendant represents that "the whole quantity [and] extent" of the ingredients making up its Products "[exist] in or [are] caused by nature; not made or caused by humankind."[5]

41.      The FDA has not promulgated a regulation defining the term "natural" or "all natural."  The FDA, however, has established a policy defining the outer boundaries of the use of the term "natural" by clarifying that a product is not natural if it contains color, artificial flavors,

---

[3] New Oxford American Dictionary 1167 (3d ed. 2010).
[4] *Id.*
[5] *Id.*

or synthetic substances.[6]  Specifically, the FDA states: "the agency will maintain its policy (Ref. 32) regarding the use of 'natural,' as meaning that nothing artificial or synthetic (including all color activities regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food."  58 Fed. Reg. 2302, 2407 (Jan. 6, 2003). Although this definition is not a regulation, it is the "most definitive statement of the agency's view."

42.    On November 10, 2015, the FDA stated it would take public comments on whether the FDA should become involved in governing the term "natural" when used on food products.[7]  The FDA has asked for public comments due, in part, to a petition by Consumer Reports for a ban on use of the term "natural" by food companies because of the consumer deception and confusion the use of the term creates.[8]  It is far from certain the FDA will act to regulate the term "natural" following this request for public comment or otherwise.  Indeed, the agency previously declined to take any action when three district courts referred the issue of "natural" labeling to the FDA in 2015.

43.    The United States Department of Agriculture ("USDA"), which regulates the labeling of meat and poultry, has also set limits and offered instructive and helpful guidance on use of the term "natural."  The USDA's Food Safety and Inspection Service dictates that the term

_____

[6] *See* http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm094536.htm and http://www.fda.gov/AboutFDA/Transparency/Basics/ucm214868.htm (last visited Dec. 15, 2015).

[7] *See* "U.S. Food and Drug Administration: FDA Requests Comments on Use of the Term Natural on Food Labeling" (2015), *available at* http://www.fda.gov/Food/NewsEvents/ConstituentUpdates/ucm471919.htm (October 28, 2016).

[8] *See* "End the Confusion over the Term 'Natural' on Food Labels: Consumer Reports calls for a Ban on this Misleading Word," CONSUMER REPORTS (July 4, 2014) ("Due to overwhelming and ongoing consumer confusion around the natural food label, we are launching a new campaign to kill the natural label because our poll underscores that it is misleading, confusing, and deceptive").

"natural" may be used on labeling of meat and poultry products so long as "(1) the product does not contain any artificial flavor or flavorings, color ingredient, or chemical preservatives…or any other artificial or synthetic ingredient, and (2) the product and its ingredients are not more than minimally processed."[9]

44.     According to the USDA, "[m]inimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, *e.g.*, smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, *e.g.*, grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices."   However, "[r]elatively severe processes, *e.g.*, solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing."[10]

45.     Under the USDA's guidelines, if a product contains artificial or synthetic ingredients, or is severely processed, the product can still be labeled "all natural" but only if: (1) the ingredient would not significantly change the character of the product to the point that it could no longer be considered a natural product; and (2) ***the natural claim [is] qualified to clearly and conspicuously identify the ingredient, e.g., all natural or all natural ingredients except dextrose, modified food starch, etc.***"[11]   (emphasis added).

---

[9] *See* United States Department of Agriculture Food Standards and Labeling Policy book, Aug. 2005, *available at* http://www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf (last visited Dec. 15, 2015).
[10] *Id.*
[11] *Id.*

46.     Congress has elsewhere defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes."  7 U.S.C. § 6502(21).  *See also* 7 C.F.R. § 205.1, *et seq.* (defining, in USDA's National Organic Program regulations, a "nonsynthetic" as "a substance that is derived from mineral, plant, or animal matter and does not undergo a synthetic process as defined in section 6502(21) of the Act (7 U.S.C. § 6502(21)")).

47.     The terms "synthetic" and "artificial" closely resemble each other and, in lay use, are considered synonymous.  The scientific community defines "artificial" as something not found in nature, whereas "synthetic" is defined as something man-made, whether it merely mimics nature or is not found in nature.[12]  In the scientific community, "synthetic" includes substances that are also artificial, but a synthetic substance also can be artificial or non-artificial.[13]  The lay understanding of "artificial" is consistent with the scientific community's definition of "synthetic."  Oxford Dictionaries, at www.oxforddictionaries.com, defines "artificial" as "made or produced by human beings rather than occurring naturally."  The same reference source describes "synthetic" as a synonym of "artificial," and separately defines "synthetic" as something "made by chemical synthesis."

48.     As of 2014, approximately 90% of canola, 89% of corn, and 94% of soybeans grown in the United States are genetically modified, as are a majority of the U.S. sugar beet

[12] Peter E. Nielsen, *Natural-synthetic-artificial!*, Artificial DNA: PNA & XNA, Volume 1, Issue 1 (July/August/September 2010), available at http://ncbi.nlm.nih.gov/pmc/articles/PMC3109441/.
[13] *Id.*

16

crops.[14]  Thus, any of the ingredients derived from domestically-produced canola, corn, peas, rice, or soybeans are highly likely to contain GMOs, despite Defendant's "Non GMO" labeling. Independent testing has confirmed the presence of GMOs in at least some of the Products.

49.     In addition to being derived from GMOs, many of the Products' ingredients are also synthetic, chemically synthesized, and/or highly processed to the point where they no longer resemble any natural source.  Thus, any food containing these synthetic and/or processed ingredients cannot be called "All Natural."  These non-natural ingredients include, without limitation:

a.      **Soy Lecithin**.  Soy Lecithin is a processed by-product of soybean oil production.  It is derived from the sludge left after crude oil undergoes a degumming process. More specifically, to produce soybean oil, soybeans are ground into small fragments and then flakes.  The flakes are then combined with hexane or another similar solvent.  Because soybean oil is soluble in hexane, this process removes the oil from the flakes—leaving crude soybean oil with gums or sludge—including a large quantity of hexane or similar solvent.  The resulting product is subjected to heat to remove the solvents.  Clarified soybean oil is then produced when the gum and water are mechanically separated from the crude soybean oil.  The waste sludge or gum left remaining is then dried to produce lecithin.  23 of the 37 Products contain soy lecithin: (1) KIND Bar Fruit & Nut: Almond & Apricot; (2) KIND Bar Fruit & Nut: Almond & Coconut; (3) KIND Bar Fruit & Nut: Almonds & Apricots in Yogurt; (4) KIND Bar Fruit & Nut: Apple Cinnamon & Pecan; (5) KIND Bar Fruit & Nut: Blueberry Vanilla & Cashew; (6) KIND Bar Fruit & Nut: Fruit & Nut Delight; (7) KIND Bar Fruit & Nut: Fruit & Nuts in Yogurt; (8) KIND

---

[14] *See* http://www.ers.usda.gov/media/185551/biotechcrops_d.html (last visited Dec. 14, 2015); *see also* http://www.huffingtonpost.com/margie-kelly/genetically-modified-food_b_2039455.html (last visited Dec. 14, 2015).

Bar Fruit & Nut: Nut Delight; (9) KIND Bar Fruit & Nut: Peanut Butter & Strawberry; (10)

KIND Bar Plus: Almond Walnut Macadamia with Peanuts; (11) KIND Bar Plus: Blueberry

Pecan; (12) KIND Bar Plus: Dark Chocolate Cherry Cashew + Antioxidants; (13) KIND Bar

Plus: Peanut Butter Dark Chocolate; (14) KIND Bar Plus: Pomegranate Blueberry Pistachio +

Antioxidants; (15) KIND Bar Nuts & Spices: Caramel Almond & Sea Salt; (16) KIND Bar Nuts

& Spices: Cashew & Ginger Spice; (16) KIND Bar Nuts & Spices: Dark Chocolate Chili

Almond; (17) KIND Bar Nuts & Spices: Dark Chocolate Cinnamon Pecan; (18) KIND Bar Nuts

& Spices: Dark Chocolate Mocha Almond; (19) KIND Bar Nuts & Spices: Dark Chocolate Nuts

& Sea Salt; (20) KIND Bar Nuts & Spices: Madagascar Vanilla Almond; (21) KIND Bar Nuts &

Spices: Maple Glazed Pecan & Sea Salt; (22) KIND Healthy Grains Bar: Dark Chocolate Chunk;

and (23) KIND Healthy Grains Bar: Peanut Butter Dark Chocolate.

    b. **Soy Protein Isolate.** Soy protein isolate is refined through the use of a

volatile synthetic solvent, hexane.  Federal Regulations list hexane as a "synthetic organic

chemical manufacturing industry chemical."  *See* 40 C.F.R. 63, Subpt. F, Tbl. 1.  Hexane is a

constituent of gasoline derived from crude oil, natural gas liquids, or petroleum refinery

processing.  40 C.F.R. § 99.2155.  The United States Occupational Safety and Health

Administration ("OSHA") defines hexane as a narcotic and neurotoxic agent that can cause

irritation to the eyes and upper respiratory tract.  Commercial hexane also contains benzene, a

known hematologic poison linked to leukemia.  Hexane and hexane-processed ingredients cannot

reasonably or responsibly be classified or described as "natural" or included as an ingredient in

an "all natural" food product.  Five (5) of the 37 Products contain soy protein isolate: (1) KIND

Bar Fruit & Nut: Peanut Butter & Strawberry; (2) KIND Bar Plus: Almond Walnut Macadamia

with Peanuts; (3) KIND Bar Plus: Peanut Butter Dark Chocolate; (4) KIND Healthy Grains

18

Clusters: Fruit & Nut Clusters; and (5) KIND Healthy Grains Clusters: Peanut Butter Whole Grain Clusters.

    c.  **Citrus Pectin**.  Citrus pectin is a fiber plentiful in citrus fruit rind.  It is indigestible in the human body.  Also known as Modified Citrus Pectin ("MCP"), it is a form of pectin that has been altered through human controlled processes so that it can be more easily absorbed in the human digestive tract.  MCP is made when naturally occurring citrus pectin's pH is altered, generally through treatment with sodium hydroxide and hydrochloric acid.  The resulting breakdown or depolymerization of the natural pectin creates a substance with shorter molecular strands comprised predominantly of D-polygalacturonates, which makes MCP more easily digestible to humans.  MCP is not natural to the reasonable consumer of food products because it is heavily and severely processed by using acids like hydrochloric acid, which break down the naturally occurring molecular chains to create resulting smaller molecular chains.  Ten (10) of the 37 Products contain citrus pectin: (1) KIND Bar Fruit & Nut: Almond & Apricot; (2) KIND Bar Fruit & Nut: Almonds & Apricots in Yogurt; (3) KIND Bar Fruit & Nut: Blueberry Vanilla & Cashew; (4) KIND Bar Fruit & Nut: Fruit & Nut Delight; (5) KIND Bar Fruit & Nut: Fruit & Nuts in Yogurt; (6) KIND Bar Fruit & Nut: Peanut Butter & Strawberry; (7) KIND Bar Plus: Blueberry Pecan; (8) KIND Bar Plus: Pomegranate Blueberry Pistachio + Antioxidants; (9) KIND Healthy Grains Bar: Vanilla Blueberry; and (10) KIND Healthy Grains Clusters: Vanilla Blueberry Clusters with Flax Seeds.

    d.  **Glucose Syrup / "Non GMO" Glucose.**  Non GMO glucose is more commonly known as glucose syrup, dried glucose syrup, or corn syrup.  *See* 21 C.F.R. 184.1865. Glucose syrup is the liquid form of starch and can be derived from wheat, potato, or rice.  Most companies, however, use cornstarch to produce glucose syrup.  Upon information and belief,

Plaintiffs aver and allege that non GMO glucose found in the Products is derived from GMO corn.  To leach the starch from the corn kernel, the shelled corn is soaked for several hours in a dilute sulfur dioxide solution, which is a synthetic substance.  Once the starch is leached, it is then further processed to produce glucose syrup.  24 of the 37 Products contain glucose syrup or "non GMO" glucose: (1) KIND Bar Fruit & Nut: Almond & Apricot; (2) KIND Bar Fruit & Nut: Almond & Coconut; (3) KIND Bar Fruit & Nut: Almonds & Apricots in Yogurt; (4) KIND Bar Fruit & Nut: Apple Cinnamon & Pecan; (5) KIND Bar Fruit & Nut: Blueberry Vanilla & Cashew; (6) KIND Bar Fruit & Nut: Fruit & Nut Delight; (7) KIND Bar Fruit & Nut: Fruit & Nuts in Yogurt; (8) KIND Bar Fruit & Nut: Nut Delight; (9) KIND Bar Fruit & Nut: Peanut Butter & Strawberry; (10) KIND Bar Plus: Almond Cashew With Flax + Omega 3; (11) KIND Bar Plus: Almond Walnut Macadamia with Peanuts; (12) KIND Bar Plus: Blueberry Pecan; (13) KIND Bar Plus: Cranberry Almond + Antioxidants with Macadamia Nuts; (14) KIND Bar Plus: Dark Chocolate Cherry Cashew + Antioxidants; (15) KIND Bar Plus: Peanut Butter Dark Chocolate; (16) KIND Bar Plus: Pomegranate Blueberry Pistachio + Antioxidants; (17) KIND Bar Nuts & Spices: Caramel Almond & Sea Salt; (18) KIND Bar Nuts & Spices: Cashew & Ginger Spice; (19) KIND Bar Nuts & Spices: Dark Chocolate Chili Almond; (20) KIND Bar Nuts & Spices: Dark Chocolate Cinnamon Pecan; (21) KIND Bar Nuts & Spices: Dark Chocolate Mocha Almond; (22) KIND Bar Nuts & Spices: Dark Chocolate Nuts & Sea Salt; (23) KIND Bar Nuts & Spices: Madagascar Vanilla Almond; and (24) KIND Bar Nuts & Spices: Maple Glazed Pecan & Sea Salt.

e.     **Vegetable Glycerine.**  Vegetable glycerine, also known as glycerol or glycerin, is a well-recognized synthetic product.  *See* 21 C.F.R § 172.866; 7 C.F.R. § 205.605(b); 7 C.F.R. § 205.603; 21 C.F.R. § 178.3500.  It is used in some food products as a sweetener or a

20

preservative.  Vegetable glycerine is commonly produced commercially through the hydrolysis of fats and oils during the manufacturing of soap products, or synthesized from the hydrogenolysis of carbohydrates or from petrochemicals.  In food products, vegetable glycerine is commonly derived from soybeans.  Ten (10) of the 37 Products contain vegetable glycerine: (1) KIND Bar Fruit & Nut: Almond & Apricot; (2) KIND Bar Fruit & Nut: Almonds & Apricots in Yogurt; (3) KIND Bar Fruit & Nut: Blueberry Vanilla & Cashew; (4) KIND Bar Fruit & Nut: Fruit & Nut Delight; (5) KIND Bar Fruit & Nut: Fruit & Nuts in Yogurt; (6) KIND Bar Fruit & Nut: Peanut Butter & Strawberry; (7) KIND Bar Plus: Blueberry Pecan; (8) KIND Bar Plus: Pomegranate Blueberry Pistachio + Antioxidants; (9) KIND Healthy Grains Bar: Vanilla Blueberry; and (10) KIND Healthy Grains Clusters: Vanilla Blueberry Clusters with Flax Seeds.

       f.      **Palm Kernel Oil.**  Unlike palm oil, palm kernel oil contains more saturated fat.  Because it has similar properties to trans fats, palm kernel oil became an inexpensive replacement when trans fats were removed from the market due to negative health consequences. This ingredient is mechanically extracted from the palm kernel nut most often through the use of synthetic solvents such as hexane.  Nine (9) of the 37 Products contain palm kernel oil: (1) KIND Bar Fruit & Nut: Almonds & Apricots in Yogurt; (2) KIND Bar Fruit & Nut: Fruit & Nuts in Yogurt; (3) KIND Bar Plus: Dark Chocolate Cherry Cashew + Antioxidants; (4) KIND Bar Plus: Peanut Butter Dark Chocolate; (5) KIND Bar Nuts & Spices: Caramel Almond & Sea Salt; (6) KIND Bar Nuts & Spices: Dark Chocolate Chili Almond; (7) KIND Bar Nuts & Spices: Dark Chocolate Cinnamon Pecan; (8) KIND Bar Nuts & Spices: Dark Chocolate Mocha Almond; and (9) KIND Bar Nuts & Spices: Dark Chocolate Nuts & Sea Salt.

       g.      **Canola Oil.**  Many types of cooking oils are extracted through processes that allow the oils to retain the chemical composition occurring in nature.  Cold pressed olive oil,

21

for example, is produced through a mechanical process of compressing the oil from olives.

Chemicals can also be used in the extraction process to obtain a higher yield of oil.  However,

chemically, the oil at the end of the process is the same as it was at the beginning of the process.

In contrast, the processes used to create canola oil go well beyond mere extraction techniques,

resulting in a chemically altered ingredient.  Canola oil undergoes several distinct chemical

processes: (1) extraction; (2) alkali-neutralization; (3) bleaching; (4) deodorizing; and (5)

conditioning.  To extract crude oil from the canola seed (rapeseed), the manufacturer first applies

a physical press to the vegetable, which typically extracts a fraction of the extractable oil.

Rapeseed oil extraction also requires high temperatures.  As part of the extraction process, the

vegetables are then treated with Hexane, a carcinogenic chemical linked to cancer and other

major health problems in studies conducted on animals, to extract the remaining crude oil.

Residual Hexane may be present in the final product.  After it has been extracted from the

vegetable, the crude oil is neutralized with an alkaline soap solution that separates and removes

the free fatty acids ("FFAs").  The soap solution is typically separated from the neutralized oil by

centrifugal separation.  Potassium Hydroxide, a corrosive acid, is used to facilitate the reaction

between the alkaline solution and FFAs.  After neutralization, the oil is bleached and deodorized

with additional cleaning solutions to lighten the oil's color and minimize its odor.  After being

bleached and deodorized, cooking oils such as the Products are conditioned by the use of a high-

concentration Phosphoric Acid, consumption of which has been linked to lower bone density as

well as chronic kidney disease.  Upon information and belief, Plaintiffs aver and allege that the

canola oil found in the Products is derived from GMO canola.  11 of the 37 Products contain

canola oil.  (1) KIND Healthy Grains Bar: Dark Chocolate Chunk; (2) KIND Healthy Grains

Bar: Maple Pumpkin Seeds with Sea Salt; (3) KIND Healthy Grains Bar: Oats & Honey with

22

Toasted Coconut; (4) KIND Healthy Grains Bar: Peanut Butter Dark Chocolate; (5) KIND

Healthy Grains Bar: Vanilla Blueberry; (6) KIND Healthy Grains Clusters: Cinnamon Oat

Clusters with Flax Seeds; (7) KIND Healthy Grains Clusters: Fruit & Nut Clusters; (8) KIND

Healthy Grains Clusters: Maple Quinoa Clusters with Chia Seeds; (9) KIND Healthy Grains

Clusters: Oats & Honey Clusters with Toasted Coconut; (10) KIND Healthy Grains Clusters:

Raspberry Clusters with Chia Seeds; and (11) KIND Healthy Grains Clusters: Vanilla Blueberry

Clusters with Flax Seeds.

      h.    **Ascorbic Acid.**  Ascorbic acid occurs naturally in certain foods as

Vitamin C, or L-ascorbic acid.  However, ascorbic acid used as a Vitamin C supplement in foods

is not naturally-occurring.  Rather, it is synthesized through a combined chemical-organic

process known as the Reichstein Process.  The Reichstein Process uses the following steps: (a)

hydrogenation of D-glucose to D-sorbitol, an organic reaction with nickel as a catalyst under

high temperature and high pressure; (b) Microbial oxidation or fermentation of sorbitol to L-

sorbose with acetobacter at pH 4-6 and 30° C; (c) protection of the 4 hydroxyl groups in sorbose

by formation of the acetal with acetone and an acid to Diacetone-L-sorbose

(2,3:4,6−Diisopropyliden−α−L−sorbose); (d) Organic oxidation with potassium permanganate

followed by heating with water to yield 2-Keto-L-gulonic acid; and (e) a ring-closing step or

gamma lactonization with removal of water.  As a food ingredient, ascorbic acid typically is

derived from corn-based glucose.  Upon information and belief, Plaintiffs aver and allege that

ascorbic acid found in the Products is derived from GMO corn.  Three (3) of the 37 Products

contain ascorbic acid: (1) KIND Bar Plus: Cranberry Almond + Antioxidants with Macadamia

Nuts; (2) KIND Bar Plus: Dark Chocolate Cherry Cashew + Antioxidants; and (3) KIND Bar

Plus: Pomegranate Blueberry Pistachio + Antioxidants.

23

i.       **Vitamin A Acetate.**  Vitamin A Acetate is a yellow, fat-soluble substance

that is unstable in its pure alcohol form.  Consequently, for commercial food production, it is

chemically produced and administered as esters also known as retinyl acetate or palmitate.

Three (3) of the 37 Products contain Vitamin A Acetate: (1) Cranberry Almond + Antioxidants

with Macadamia Nuts; (2) KIND Bar Plus: Dark Chocolate Cherry Cashew + Antioxidants; and

(3) KIND Bar Plus: Pomegranate Blueberry Pistachio + Antioxidants.

j.       **D-Alpha Tocopheryl Acetate / Vitamin E.**  D-Alpha Tocopheryl

Acetate, a synthetic, water-soluble form of Vitamin E, is often found in processed foods as a

preservative.  16 of the 37 Products contain D-Alpha Tocopheryl Acetate / Vitamin E, and

Defendant's ingredient list indicates the ingredient's addition as a preservative "for freshness":

(1) Cranberry Almond + Antioxidants with Macadamia Nuts; (2) KIND Bar Plus: Dark

Chocolate Cherry Cashew + Antioxidants; (3) KIND Bar Plus: Pomegranate Blueberry Pistachio

+ Antioxidants; (4) KIND Healthy Grains Bar: Dark Chocolate Chunk; (5) KIND Healthy Grains

Bar: Maple Pumpkin Seeds with Sea Salt; (6) KIND Healthy Grains Bar: Oats & Honey with

Toasted Coconut; (7) KIND Healthy Grains Bar: Peanut Butter Dark Chocolate; (8) KIND

Healthy Grains Bar: Vanilla Blueberry; (9) KIND Healthy Grains Clusters: Banana Nut Clusters;

(10) KIND Healthy Grains Clusters: Cinnamon Oat Clusters with Flax Seeds; (11) KIND

Healthy Grains Clusters: Fruit & Nut Clusters; (12) KIND Healthy Grains Clusters: Maple

Quinoa Clusters with Chia Seeds; (13) KIND Healthy Grains Clusters: Oats & Honey Clusters

with Toasted Coconut; (14) KIND Healthy Grains Clusters: Peanut Butter Whole Grain Clusters;

(15) KIND Healthy Grains Clusters: Raspberry Clusters with Chia Seeds; and (16) KIND

Healthy Grains Clusters: Vanilla Blueberry Clusters with Flax Seeds.

k.    **Annatto.**  Annatto is artificial coloring that is chemically extracted from the annatto seed for use in processed food products.  21 CFR § 101.22(a)(4).  One (1) Product, KIND Bar Nuts & Spices: Caramel Almond & Sea Salt, contains annatto.

## V.  RULE 9(B) ALLEGATIONS

50.    Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

51.    WHO:  KIND made material misrepresentations and omissions of fact in the labeling, packaging, and marketing of the Products.

52.    WHAT:  Defendant made material misrepresentations and omissions of fact by using the terms "all natural," and/or "non-GMO"" in the labeling, packaging, and marketing of the Products.  Defendant made these claims with respect to the Products even though the Products did not meet the requirements to make such claims.  Defendant's misrepresentations and omissions were material because a reasonable consumer would not have purchased or paid as much for the Products if he or she knew that they contained false representations.

53.    WHEN: Defendant made the material misrepresentations and omissions detailed herein continuously throughout the Class Period.

54.    WHERE:  Defendant's material misrepresentations and omissions were made, *inter alia*, on the labeling and packaging of the Products, on Defendant's website (www.kindsnacks.com), and through Defendant's various other advertisements.

25

55.     HOW: Defendant made written misrepresentations and failed to disclose material

facts on the labeling and packaging of the Products and on its website and other advertising.

56.     WHY: Defendant engaged in the material misrepresentations and omissions

detailed herein for the express purpose of inducing Plaintiffs and other reasonable consumers to

purchase and/or pay a premium for Products based on the belief that they were "all natural,"

and/or "non-GMO." Defendant profited by selling the Products to millions of unsuspecting

consumers nationwide.

## VI.  CLASS ACTION ALLEGATIONS

57.     <u>Class Definition</u>.  Pursuant to Federal Rules of Civil Procedure 23(b)(2) and

(b)(3), Plaintiffs bring this case as a class action on behalf of classes of individuals in the United

States, as well as California and New York, and Florida Sub-Classes, defined as follows:

> <u>Nationwide Class</u>:  All persons in the United States who purchased
> the Products for their personal use and not for resale at any time
> since April 17, 2011.

> <u>California Sub-Class</u>:  All persons in the State of California who
> purchased the Products for their personal and not for resale use at
> any time since April 17, 2011.

> <u>New York Sub-Class</u>:  All persons in the State of New York who
> purchased the Products for their personal use and not for resale at
> any time since April 17, 2009.

> <u>Florida Sub-Class</u>:  All persons in the State of Florida who
> purchased the Products for their personal use and not for resale at
> any time since April 17, 2011.

Excluded from the above Classes are Defendant, any entity in which Defendant has a controlling interest or that has a controlling interest in Defendant, and Defendant's legal representatives, assignees, and successors.  Also excluded are the Judge to whom this case is assigned and any member of the Judge's immediate family.

58.    <u>Numerosity</u>.  The Classes are each so numerous that joinder of all members is impracticable.  On information and belief, the Classes each have more than 1,000 members. Moreover, the disposition of the claims of the Classes in a single action will provide substantial benefits to all parties and the Court.

59.    <u>Commonality</u>.  There are numerous questions of law and fact common to Plaintiffs and Class Members.  These common questions of law and fact include, but are not limited to, the following:

a.    Whether the Products are falsely labeled as "all natural";

b.    Whether the Products are falsely labeled as "non-GMO";

c.    Whether Defendant materially misrepresented to Class Members that the Products are "all natural" and free from synthetic or unnatural ingredients;

d.    Whether Defendant materially misrepresented to Class Members that the Healthy Products are healthy;

e.    Whether Defendant's misrepresentations and omissions were material to reasonable consumers;

f.    Whether Defendant's labeling, marketing, and sale of the Products constitutes deceptive conduct;

g.    Whether Defendant's conduct described above constitutes a breach of warranty;

27

h.      Whether Defendant was unjustly enriched due to its iniquitous conduct;

i.      Whether Defendant's conduct injured consumers and, if so, the extent of the injury; and

j.      The appropriate remedies for Defendant's conduct.

60.    <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the Classes.  Plaintiffs suffered the same injury as Class Members—*i.e.*, Plaintiffs purchased the Products after seeing Defendant's misleading representations about the quality and nature of those Products and paid more money than they otherwise would have for the actual unnatural and GMO Products they received.

61.    <u>Adequacy</u>.  Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained competent and capable attorneys with significant experience in complex and class action litigation, including consumer class actions.  Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with those of the proposed Classes.

62.    <u>Predominance</u>.  Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members.  The common issues arising from this conduct that affect Plaintiffs and Class Members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

63.    <u>Superiority</u>.  A class action is the superior method for the fair and efficient adjudication of this controversy.  In this regard, the Class Members' interests in individually controlling the prosecution of separate actions is low given the magnitude, burden, and expense of individual prosecutions against large corporations such as Defendant.  It is desirable to

concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits. Individualized litigation presents a potential for inconsistent or contradictory judgments, and also increases the delay and expense to all parties and the court system presented by the legal and factual issues of this case.  By contrast, the class action procedure here will have no management difficulties.  Defendant's records and the records available publicly will easily identify the Class Members.  The same common documents and testimony will be used to prove Plaintiffs' claims as well as the claims of Class Members.  Finally, proceeding as a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

64.     <u>Injunctive and Declaratory Relief Appropriate</u>.  A class action is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all Class Members.

## VII.  FIRST CLAIM FOR RELIEF

## (Breach of Express Warranty – Nationwide Class or, in the Alternative, the State-Wide Sub-Classes)

65.     Plaintiffs reallege and incorporate by reference all preceding factual allegations.

66.     Defendant provided Plaintiffs and Class Members with written express warranties including, but not limited to, warranties that the Products were all natural and non-GMO.

67.     These representations became part of the basis of the bargain between Plaintiffs and Class Members, on the one hand, and Defendant, on the other.

68.     Defendant represented and warranted that the Products were all natural and non-GMO, but Defendant breached that warranty because the Products contain unnatural ingredients such as soy lecithin.

69.     Defendant made the above-described representations to induce Plaintiffs and Class Members to purchase the Products, and Plaintiffs and Class Members relied on the representations in purchasing the Products.

70.     All conditions precedent to Defendant's liability under have been performed by Plaintiffs and Class Members, who paid the asking price for the Products in question.

71.     Defendant's breach resulted in damages to Plaintiffs and Class Members, who bought the Products but did not receive the goods as warranted.

72.     As a result of Defendant's breaches of express warranty, Plaintiffs and Class Members were damaged in the amount of the purchase price they paid for the Products. Plaintiffs and Class Members were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted.  Alternatively, Plaintiffs and Class Members would not have purchased the Products had they known the true facts about them.

## VIII.  SECOND CLAIM FOR RELIEF

## (Unjust Enrichment/Common Law Claim for Restitution – Nationwide Class or, in the Alternative, the State-Wide Sub-Classes)

73.     Plaintiffs reallege and incorporate by reference all preceding factual allegations.

30

74.     Because of their wrongful acts and omissions, Defendant charged a higher price for the Products than the Products' true value and Defendant obtained monies that rightfully belong to Plaintiffs and Class Members.

75.     Plaintiffs and Class Members conferred a benefit on Defendant by purchasing the Products.

76.     Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and Class Members.  It would be inequitable and unjust for Defendant to retain these wrongfully obtained profits.

77.     Plaintiffs, therefore, seek an order requiring Defendant to make restitution to them and Class Members.

## IX.  THIRD CLAIM FOR RELIEF

### (Negligent Misrepresentation – Nationwide Class or, in the Alternative, the State-Wide Sub-Classes)

78.     Plaintiffs reallege and incorporate by reference all preceding factual allegations.

79.     Defendant made representations to Plaintiffs and Class Members through the labeling, packaging, and marketing of the Products that the products were "all natural," and/or "non-GMO.". Defendant made these representations knowing that such claims would be material to a reasonable consumer's purchasing decision.

80.     Defendant's representations that the Products were "all natural and/or "non-GMO" were false because the Products did not meet the requirements to bear such claims. Defendant had no reasonable grounds for believing these representations were true when it made them, yet it intended that Plaintiffs and Class Members would rely on these representations.

31

81.     Defendant had a pecuniary interest in the marketing, advertising and promotion of the Products and in making the careless, unreasonable and negligent misrepresentations and omissions alleged herein, including to Plaintiffs and the Class Members.

82.     Defendant's misrepresentations regarding the health, characteristics, composition, and quality of the Products were material because a reasonable consumer would attach importance to them in determining whether to purchase and consume the Products.

83.     Defendant's material misrepresentations concerning the health, characteristics, composition, and quality of the Products were false and made without reasonable grounds for believing them to be true.

84.     Defendant was in a superior position than Plaintiffs and Class Members to know the material facts that would influence a consumer's purchasing decision.

85.     Defendant could reasonably foresee that Plaintiffs and the Class Members were likely to rely upon the misrepresentations or omissions.

86.     Defendant made material misrepresentations concerning the health, characteristics, composition, and quality of the Products with the intent to induce Plaintiffs and Class Members to purchase and consume the Products.

87.     Under the circumstances, Defendant has a duty to disclose material, truthful information represented or omitted in its careless, unreasonable and negligent misrepresentations and omissions, as set for herein.

88.     Plaintiffs and Class Members reasonably and materially relied on Defendant's material misrepresentations in choosing to purchase and consume the Products.

89.     As a result, Plaintiffs and Class Members were harmed and suffered damages in an amount to be proven at trial.

## X.  FOURTH CLAIM FOR RELIEF

### (Violation of New York General Business Law § 349 – Nationwide Class or, in the Alternative, the New York Sub-Class)

90.     Plaintiffs reallege and incorporate by reference all preceding factual allegations.

91.     NYGBL 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

92.     As fully alleged above, by advertising, marketing, distributing, and/or selling the Products with claims that they were all natural and/or non-GMO, to Plaintiffs and Class Members, Defendant engaged in, and continues to engage in, deceptive acts and practices because the Products in fact contain unnatural, synthetic ingredients and GMOs.

93.     Plaintiffs and Class Members believed Defendant's representations that the Products were all natural and non-GMO, and they would not have purchased the products at a premium price had they known the truth.

94.     Plaintiffs and Class Members were injured in fact and lost money as a result of Defendant's conduct of improperly describing the products at issue.  Plaintiffs and the Class Members paid for all natural and/or non-GMO products but did not receive such products.

95.     The products Plaintiffs and Class Members received were worth less than the products for which they paid.  Plaintiffs and Class Members paid a price premium on account of Defendant's misrepresentations that the Products were all natural and/or non-GMO.

96.     The foregoing acts and practices were directed at consumers.

97.     The foregoing deceptive acts and practices are misleading in a material way because the fundamentally misrepresent the ingredients in the Products.

98.     Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's violation of NYGBL 349 because they paid for the Products, which they would not have purchased or paid as much for, had they known the true facts.

99.     Application of NYGBL 349 to all National Class Members, regardless of their state or residence, is appropriate because, *inter alia*:

a.      Defendant's nationwide sales operations are controlled, directed, and originate from New York;

b.      Defendant's marketing operations, including the decisions regarding how to advertise, promote, and sell the Products, are made in New York, and internal marketing personnel and external marketing consultants all are based there;

c.      Defendant's sales force, customer service, and Internet website and advertising operations are controlled, directed, and originate in New York;

d.      Defendant's principal place of business is in New York;

e.      All significant employees of Defendant are based in New York; and

f.      The facts and circumstances of this case include such numerous contacts with the State of New York as to create a state interest in applying New York's consumer laws to Defendant, making application of New York law to Class Members appropriate.

100.    By reason of the foregoing, Defendant's conduct, as alleged herein, constitutes deceptive acts and practices in violation of NYGBL 349, and Defendant is liable to Plaintiffs and Class Members for the actual damages that they have suffered as a result of Defendant's actions. The amount of such damages is to be determined at trial, but will not be less than $50.00 per violation.  NYGBL 349(h).

101.     Plaintiffs and Class Members seek to enjoin such unlawful deceptive acts and practices described above.  Each Class Member will be irreparably harmed unless the Court enjoins Defendant's unlawful, deceptive actions in that Defendant will continue to falsely and misleadingly advertise the products, as detailed herein.

102.     Plaintiffs and Class Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under NYBGL 349.

## XI.  FIFTH CLAIM FOR RELIEF

**(Violation of New York General Business Law § 350 – Nationwide Class or, in the Alternative, the New York Sub-Class)**

103.     Plaintiffs reallege and incorporate by reference all preceding factual allegations.

104.     By the acts and conduct alleged herein, Defendant committed false advertising in the conduct of business, trade, or commerce in the state of New York.

105.     NYBGL 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect."

106.     The foregoing false advertisements are misleading in a material way because they fundamentally misrepresent the nature of the ingredients in the Products to induce consumers to purchase the products.

35

107.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's violation of NYBGL 350 because they paid for the Products, which they would not have purchased or paid as much for, had they known the true facts.

108.    Application of NYGBL 350 to National Class Members, regardless of their state or residence, is appropriate because, *inter alia*:

        a.      Defendant's nationwide sales operations are controlled, directed, and originate from New York;

        b.      Defendant's marketing operations, including the decisions regarding how to advertise, promote, and sell the Products, are made in New York, and internal marketing personnel and external marketing consultants all are based there;

        c.      Defendant's sales force, customer service, and Internet website and advertising operations are controlled, directed, and originate in New York;

        d.      Defendant's principal place of business is in New York;

        e.      All significant employees of Defendant are based in New York; and

        f.      The facts and circumstances of this case include such numerous contacts with the State of New York as to create a state interest in applying New York's consumer laws to Defendant, making application of New York law to the entire Class appropriate.

109.    By reason of the foregoing, Defendant's conduct, as alleged herein, constitutes false advertising in violation of NYGBL 350, and Defendant is liable to Plaintiffs and National Class Members for the actual damages that they have suffered as a result of Defendant's actions. The amount of such damages is to be determined at trial, but will be consistent with the damages prescribed in NYGBL 350(e).

110.     Plaintiffs and National Class Members seek to enjoin such unlawful acts and practices described above.  Each National Class Member will be irreparably harmed unless the Court enjoins Defendant's unlawful, deceptive actions in that Defendant will continue to falsely and misleadingly advertise the products, as detailed herein.

111.     Plaintiffs and National Class Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under NYGBL 350.

## XII.  SIXTH CLAIM FOR RELIEF

**(Violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* – California Sub-Class)**

112.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

113.     Plaintiff and Charity Bustamante (the "California Plaintiff") and each member of the California All Natural & Non-GMO Sub-Class (collectively referred to as "California Sub-Class Members") is a "Consumer" as that term is defined by Cal. Civ. Code §1761(d).

114.     The Products are each a "Good" as that term is defined by Cal. Civ. Code §1761(a).

115.     Defendant is a "Person" as defined by Cal. Civ. Code §1761(c).

116.     The transaction(s) involved here are "Transaction(s)" as defined by Cal. Civ. Code §1761(e).

37

117.    The California Plaintiff and California Sub-Class Members are consumers who purchased the Products for personal use within the applicable statute of limitations period.

118.    The California Plaintiff has standing to pursue this cause of action because Plaintiff has suffered injury-in-fact and have lost money or property as a result of Defendant's action as set forth herein.

119.    The California Plaintiff and California Sub-Class Members purchased the Products in reliance on Defendant's marketing claims that they were all natural and non-GMO,.

120.    Defendant has engaged in and continues to engage in business practices in violation of the CCLRA in at least the following ways:

    a.      Defendant has used deceptive representations with respect to the Products in violation of Cal. Civ. Code §1770(a)(4).

    b.      Defendant has misrepresented the sponsorship, approval, characteristics, or ingredients of the Products in violation of Cal. Civ. Code §1770(a)(5).

    c.      Defendant has misrepresented the standard, quality, or grade of the Products in violation of Cal. Civ. Code §1770(a)(7).

    d.      Defendant advertised the Products as all natural, and/or non-GMO when, in fact, the Products contain unnatural synthetic ingredients and/or GMO ingredients, in violation of Cal. Civ. Code §1770(a)(9).

    e.      Defendant represented that Products were supplied in accordance with a previous representation when they were not, in violation of Cal. Civ. Code §1770(a)(16).

121.    Defendant knew or should have known that its representations of fact concerning the ingredients and healthiness of the Products were material and likely to mislead consumers.

122.    Defendant's practices, acts, and course of conduct in marketing and selling the Products were, and are, are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment.  Like Plaintiff, California Sub-Class Members would not have purchased the Products had they know they were not all natural or non-GMO.

123.    The California Plaintiff and California Sub-Class Members have been directly and proximately damaged by Defendant's actions.

124.    Pursuant to California Civil Code § 1780(a) and (e), The California Plaintiff and California Sub-Class Members seek: (1) an order enjoining Defendant's unlawful business practices as alleged herein; (2) actual damages; (3) restitution; (4) ancillary relief; and (5) attorneys' fees and costs to the full extent allowed by law.

125.    There is no other adequate remedy at law, and Plaintiff and California Sub-Class Members will suffer irreparable harm unless Defendant's conduct is enjoined.

126.    The California Plaintiff provided Defendant with written notice that its conduct is in violation of the CCLRA at least thirty days prior to the filing of this Complaint.  Thus, pursuant to Cal. Civ. Code § 1782, Plaintiffs may maintain this action for damages.

127.    Defendant has engaged in, and continues to engage in, business practices in violation of the CCLRA by continuing to make false and deceptive representations concerning the ingredients contained in the Products.  These business practices are misleading and/or likely to mislead consumers and should be enjoined.

39

## XIII.  SEVENTH CLAIM FOR RELIEF

**(Violation of False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* – California Sub-Class)**

128.    Plaintiffs reallege and incorporate by reference all preceding factual allegations.

129.    The California Plaintiff and California Sub-Class Members have standing to pursue a cause of action for false advertising under the CFAL, because the California Plaintiff and California Sub-Class Members have suffered an injury-in-fact and lost money as a result of Defendant's actions as set forth herein.

130.    Defendant advertised, marketed, and otherwise disseminated information to the public through advertising mediums, including the Internet, statements to the effect that Products were all natural and non-GMO.

131.    Defendant's statements were and are false.

132.    Defendant knows and knew that these statements were false, or could have discovered their falsity with the exercise of reasonable care.

133.    Defendant's false statements were part of a scheme or plan to sell the Products to the public at a premium without disclosing that they contained unnatural and GMO ingredients.

134.    The California Plaintiff and California Sub-Class Members relied on Defendant's marketing, labeling, and other product literature that claimed the Products were all natural and non-GMO.

135.    Defendant's actions violate the CFAL.

136.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from

40

Plaintiff and California Sub-Class Members who paid a premium for the Products.  Therefore, Defendant has been unjustly enriched.

137.    The California Plaintiff and California Sub-Class Members seek injunctive relief, restitution, and restitutionary disgorgement of Defendant's ill-gotten gains as provided for by Cal. Bus. & Prof. Code § 17535.

138.    The California Plaintiff and California Sub-Class Members seek injunctive relief to compel Defendant to stop advertising the Products as all natural and non-GMO and to prevent Defendant from engaging in these wrongful practices in the future.  No other adequate remedy at law exists.  If an injunction is not ordered, the California Plaintiff and California Sub-Class Members will suffer irreparable harm and/or injury.

## XIV.  EIGHTH CLAIM FOR RELIEF

### (Violation of the Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.* – California Sub-Class)

139.    Plaintiffs reallege and incorporate by reference all preceding factual allegations.

140.    Defendant's actions as described herein constitute unfair competition within the meaning of the CUCL, insofar as the CUCL prohibits "any unlawful, unfair or fraudulent business act or practice" or "unfair, deceptive, untrue or misleading advertising."

141.    Defendant's misrepresentations and omissions of material fact as alleged herein constitute unlawful, unfair, and fraudulent business practices in that they deceived the California Plaintiff and California Sub-Class Members into believing that the Products were "all natural," "non-GMO," and featured the other health-related characteristics and qualities detailed in this Complaint.

142.    Defendant's conduct constitutes an "unlawful" business practice within the meaning of the CUCL because it violates the CCLRA, the CFAL, 21 C.F.R. 101, *et. seq*., and California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875, *et seq*.

143.    Defendant's conduct constitutes an "unfair" business practice within the meaning of the CUCL because it is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  Reasonable consumers purchased the Products believing they contained the health, characteristics, composition, and quality represented on their label and packaging. They were not aware and could not have reasonably been aware that the Products were falsely labeled as "all natural," and/or "non-GMO." Defendant's conduct in falsely labeling and packaging the Products and selling them as such has no utility or countervailing benefit and consumers could not have reasonably avoided their injury.

144.    Defendant's conduct constitutes a "fraudulent" business practice within the meaning of the CUCL insofar as Defendant's misrepresentations and omissions regarding the health, characteristics, composition, and quality of the Products were and are likely to deceive members of the public.

145.    As a direct and proximate result of Defendant's wrongful business practices in violation of the CUCL, the California Plaintiff and California Sub-Class Members have suffered injury in fact and lost money or property as a result of purchasing the Products.  The California Plaintiff and California Sub-Class Members would not have purchased or paid as much for the Products had they known the truth about their all natural, non-GMO and other nutrient content claims.

146.     Defendant's wrongful business practices constitute a continuing course of conduct of unfair competition since Defendant is labeling, marketing, and selling the Products in a manner likely to deceive the public.

147.     Pursuant to Cal. Bus. & Prof. Code § 17203, the California Plaintiff and the California Sub-Class Members seek an order of this Court enjoining Defendant from continuing to engage in unlawful, unfair, and fraudulent business practices and any other act prohibited by law, including those set forth in this Complaint.  The California Plaintiff and the California Sub-Class Members also seek an order requiring Defendant to make full restitution of all moneys it wrongfully obtained from the California Plaintiffs and the Class.

148.     Pursuant to Cal. Bus. & Prof. Code § 17203, the California Plaintiff and California Sub-Class Members seek an injunction enjoining Defendant from continuing to market, advertise, and sell the Products without first complying with federal law and to prevent Defendant from continuing to engage in unfair competition or any other act prohibited by law.

149.     penalties, including injunctive relief, treble damages, and attorneys' fees and costs of suit.

## XV.  NINTH CLAIM FOR RELIEF

**(Violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. — Florida Sub-Class)**

150.     Plaintiffs reallege and incorporate by reference all preceding factual allegations.

151.     Defendant conducts a significant amount of trade and commerce in the state of Florida.

43

152.     This cause of action is brought pursuant to the FDUTPA.  The express purpose of FDUTPA is to "protect the consuming public…from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

153.     Each sale of the Products at issue in this case was a "consumer transaction" within the scope of FDUTPA.

154.     Plaintiff Elizabeth Livingston and each member of the Florida All Natural Sub-Class and Florida Healthy Sub-Class (collectively referred to as "Florida Sub-Class Members") are "consumers" as defined by Fla. Stat. Ann. § 501.203.

155.     Defendant's Products are a "good" within the meaning of the FDUTPA. Defendant is engaged in trade or commerce within the meaning of the FDUTPA.

156.     Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

157.     Section 501.204(2), *Florida Statutes* states that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act."  Defendant's unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate Section 500.04, Florida Statutes and 21 U.S.C. § 343.

158.     Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendant has knowingly and intentionally made statements and omissions on its packaging regarding the "healthiness" and

44

positive health attributes of its Products when in fact the Products are not "healthy," do not have

the positive health attributes represented by Defendant, as well as falsely representing the

Products are "natural," when they are not, and are otherwise misbranded.

159.     Plaintiff Elizabeth Livingston and the Florida Sub-Class Members were injured as

a result of their justifiable reliance on the false and/or misleading statements made by Defendant

and its unlawful, deceptive and unfair business practices.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of Class Members, pray

for judgment against Defendant as follows:

A.     Certification of the proposed Classes;

B.     Appointment of Plaintiffs as representatives of the Classes;

C.     Appointment of the undersigned counsel as counsel for the Classes;

D.     A declaration that Defendant's actions complained of herein violate the NYGBL,

CCLRA, the CFAL, the CUCL and FDUTPA.

E.     An order enjoining Defendant and/or its affiliates, agents, and/or other related

entities, as provided by law, from engaging in the unlawful conduct set forth herein;

F.     An order requiring Defendant to notify each and every individual and/or business

who purchased the Products of the pendency of the claims in this action in order to give such

individuals and businesses an opportunity to obtain restitution from Defendant.

F.     An order compelling Defendant to engage in a corrective advertising campaign to

inform the public concerning the true nature of the Products, including a recall of the falsely and

deceptively labeled the Products.

G.      An order requiring Defendant to disgorge and make restitution of all monies

Defendant acquired by means of the unlawful practices set forth herein;

H.      An award to Plaintiffs and the Classes of damages, as allowed by law;

I.      An award to Plaintiffs and the Classes of attorneys' fees and costs, as allowed by

law and/or equity;

J.      Leave to amend this Complaint to conform to the evidence presented at trial; and

K.      Orders granting such other and further relief as the Court deems necessary, just,

and proper.

## XVII.  DEMAND FOR JURY

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

Dated:  October 31, 2016              **FINKELSTEIN, BLANKINSHIP,
                                       FREI-PEARSON & GARBER, LLP**

                                 By:     /s/ *Todd Garber*

                                       Todd S. Garber
                                       *tgarber@fbfglaw.com*
                                       D. Greg Blankinship
                                       *gblankinship@fbfglaw.com*
                                       1311 Mamaroneck Avenue, Suite 220
                                       White Plains, New York 10605
                                       Tel: (914) 298-3283
                                       Fax: (914) 824-1561

                                       Tina Wolfson
                                       *twolfson@ahdootwolfson.com*
                                       Robert Ahdoot
                                       *rahdoot@ahdootwolfson.com*
                                       Theodore W. Maya
                                       *tmaya@ahdootwolfson.com*
                                       **AHDOOT & WOLFSON, PC**
                                       1016 Palm Avenue
                                       West Hollywood, California 90069

Tel: (310) 474-9111
Fax: (310) 474-8585

Daniel L. Warshaw
*dwarshaw@pswlaw.com*
Matthew A. Pearson
*mapearson@pswlaw.com*
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403

Tel: (818) 788-8300
Fax: (818) 788-8104

*Co-Lead Counsel for Plaintiffs
and the Putative Class*